IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2013 Term

_____

No. 12-0152

_____

FILED

September 26, 2013

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

ARTHUR THORNSBURY and
VIRGINIA THORNSBURY,
Petitioners

v.

CABOT OIL & GAS CORPORATION,
Respondent

_____

Appeal from the Circuit Court of McDowell County
The Honorable Booker T. Stephens, Judge
Civil Action No. 08-C-255-S

Reversed and Remanded

_____

Submitted: September 4, 2013
Filed: September 26, 2013

Christopher L. Brinkley, Esq.          Timothy M. Miller, Esq.
The Masters Law Firm, LC               Christopher L. Hamb, Esq.
Charleston, West Virginia              Robinson & McElwee, PLLC
Counsel for the Petitioner             Charleston, West Virginia
                                       Counsel for the Respondent

The Opinion of the Court was delivered PER CURIAM.

CHIEF JUSTICE BENJAMIN and JUSTICE LOUGHRY concur, in part, and dissent, in part, and reserve the right to file separate opinions.

SYLLABUS

"A valid, unambiguous written contract may be modified or superseded by a subsequent contract based on a valuable consideration." Syllabus Point 1, *Lewis v. Dils Motor Co.*, 148 W.Va. 515, 135 S.E.2d 597 (1964).

Per Curiam:

In this appeal from the Circuit Court of McDowell County, we are asked to examine an order granting summary judgment to a defendant oil and gas developer. The circuit court found that the defendant was immune from liability for damages to the surface of a tract of land owned by the plaintiffs because of an exculpatory clause in a 1941 deed of the tract to a predecessor of the plaintiffs. The plaintiffs, however, assert that the defendant is liable for breaching a subsequent 2006 written contract that superseded the 1941 deed.

Upon appeal by the plaintiffs, we reverse the circuit court's order and remand the case for further proceedings.

I.
FACTUAL AND PROCEDURAL BACKGROUND

In 2001, petitioners (and plaintiffs below) Arthur and Virginia Thornsbury bought the surface estate of a tract of land, about 30 acres in size, in McDowell County. The parties agree that the Thornsburys own only the surface of the tract, and that the Tug Fork Land Company owns all of the oil and gas underlying the tract.

Respondent Cabot Oil & Gas Corporation ("Cabot") claims that, in 1949, it leased the rights to the gas under the tract.[1] In 2006, Cabot approached the Thornsburys

---

[1] On September 26, 2006, Arthur Thornsbury signed an affidavit acknowledging Cabot as "the oil and gas leasehold interest owner in and to" the Thornsburys' land.

1

seeking permission to build a road on the surface of the tract of land so it could install a natural gas well. On May 24, 2006, the Thornsburys and Cabot entered into a written contract allowing Cabot to build a 200-foot access road, and in exchange Cabot agreed to pay the Thornsburys $500.00. The contract, styled "Right-of-Way Grant," was signed by both of the parties. It states that the road would be built:

> Upon the route described in general terms as follows: Beginning at Negro Branch [Creek] thence running in an easterly direction to and with the line of [the adjoining property owned by] Shirley B. Vance. . . .

While most of the contract is typed, a hand-written interlineation says that the road to be built by Cabot would be only 200 feet in length.[2] Cabot further agreed that, in building the road, it "shall stack all timber ten (10) inches and larger."

Shortly thereafter, Cabot prepared an "Access Road Right-of-Way Acquisition Report." This document, dated June 7, 2006, again states that Cabot had acquired, for $500.00, a right of way with "Length: 200 (approx.) feet." The "special provisions" for the right of way included a duty by Cabot to "Stack timber 10 inches and

---

[2] The May 24, 2006 contract states, in pertinent part (and with handwritten interlineations in italics):

> Cabot Oil & Gas Corporation will pay within 45 days of receipt of the subject Access Road Right-of-Way *200'* properly executed, the sum of ~~Three~~ *Five* Hundred and no/100 Dollars (~~$300.00~~ *$500.00*) which represents the full consideration for said Access Road Right-of-Way . . .

The handwritten interlineations were initialed by Cabot's representative and by the Thornsburys.

2

larger." A later letter by Cabot to the Thornsburys, and a Well Work Permit issued by the West Virginia Department of Environmental Protection, similarly say that "[a]ny salvageable timber will be cut and stacked to the side of the roadway or removed to a stockpile area" by Cabot.

Cabot later entered onto the Thornsburys' surface tract and constructed a roadway approximately 1,300 feet long. Cabot drilled a natural gas well, and allegedly erected an above-ground pipeline across the tract, bisecting the tract and making a portion of it inaccessible. In building the road, drill site and pipeline, Cabot allegedly failed to stack any timber.

On October 10, 2008, the Thornsburys sued Cabot. In their complaint, they alleged that Cabot had breached the May 2006 Right-of-Way Grant contract by building a road longer than 200 feet, building it in the wrong location, and by failing to stack the timber that had been cut. The Thornsburys also sought the value of the surface estate used by Cabot for the placement of the well and for the above-ground pipeline, neither of which were addressed in or relate to the Right-of-Way Grant. The Thornsburys alleged that Cabot's placement of the well and pipeline had rendered large portions of their property worthless because it interfered with their ability to access and remove timber, or to use the tract for four-wheeling.

During discovery, Cabot asserted that it had the right to engage in mineral development pursuant to a 1949 lease from the mineral owner, and that the 2006 Right-of-Way Grant was not binding and had only been executed "out of an abundance of

3

caution."[3]  The Thornsburys countered that the 1949 lease between Cabot and the mineral owner required Cabot to "bury all permanent oil and gas lines . . . [to] at least plow depth" and to pay "for all timber that it is necessary to cut and for all damages done to timber, fences, buildings, or crops, or other property[.]"[4]  The Thornsburys were not a party or in privity to this lease.

---

[3] Cabot's answer to the Thornsburys' complaint states:

> [Cabot] avers that it had the right to build the roadway across the Thornsbury property pursuant to that certain lease dated October 22, 1949. . . . [Cabot] nevertheless entered into the Right-of-Way with the [Thornsburys] . . . out of an abundance of caution to make sure they had ratified and confirmed their right to build a roadway across the surface property, and to remove any potential dispute as to the location of the surface property boundaries due to the ambiguous nature of the property descriptions for the surface properties.

[4] In their brief, it appears that the Thornsburys are attempting to develop a theory that they are beneficiaries of the sixth clause of the 1949 lease from the mineral rights owner to Cabot, which states:

> [Cabot] shall, when required by Lessor, bury all permanent oil and gas lines across improved or cultivated property at least plow depth, and shall pay Lessor or any coal mining or other lessees of Lessor, as their respective interests may appear, for all timber that it is necessary to cut and for all damages done to timber, fences, buildings, or crops, or other property, in any operations of [Cabot].

The Thornsburys' brief also asserts that the 1949 lease required Cabot to drill its well within five years, or the lease expired.  In 1964, Cabot signed a new lease extending the 1949 lease, and the lease was again for a five-year period or for as long as oil and gas were produced.  The Thornsburys contend that because no well was drilled (or oil and gas produced) on their 30-acre tract until 2007, the 1949 and 1964 leases had long-since expired.  Cabot, however, claims that the leases were for oil and gas

(continued . . .)

4

In October 2011, after the conclusion of discovery, Cabot filed a motion for summary judgment. Attached as an exhibit to the motion was a May 19, 1941, deed that created the 30-acre surface estate now owned by the Thornsburys. The 1941 deed severed "the surface and surface only" of the 30-acre tract from all of the minerals below, and reserved to the grantor "all the coal, oil, gas, stone, water and other minerals of every kind and character in, on, and underlying said land[.]"

Cabot asserted it was entitled to summary judgment because of an exculpatory clause within the 1941 deed. That exculpatory clause states that the grantor (McDowell-Wyoming Land Company) reserved to itself

> the right on the part of the grantor, its successors, lessees and assigns, at any time or times hereafter to mine and remove any and all of said coal and other minerals and to engage in any and all undertakings in, upon, under and across said land which the grantor, its successors, lessees and assigns may at any time deem expedient, all without liability on the part of the grantor, its successors, lessees and assigns, to the grantees, or to any person or persons claiming or to claim through or under the grantee for any injury to the surface of said land or to any structure or other property thereon by reason of such mining or removing of such coal and other minerals or by reason of caving or pumping out or the escape of water on said land, or by placing thereon refuse from any mine or mines; the right to drill, sink, construct and operate in, and upon said land all such prospect holes, prospect shafts or water and hoisting shafts, and all such slopes as the grantor, its successors, lessees and assigns shall at any time deem expedient, and to have and use sufficient right of way to and from the same; the right to appropriate and use the surface of said land at or about any prospect, air, water or

underlying 2,129 acres, of which the Thornsburys' 30-acre tract is but a small part, and claims it "has been in full force and effect since its inception."

5

hoisting shafts; the right to transport upon, under and across said land coal and other minerals to and from any other lands that are now or that any time hereafter may be owned or leased by the grantor, its successors, lessees and assigns; the right to transport upon, under and across said land to and from any other lands that are now or that at any time hereafter may be owned or leased by the grantor, its successors, lessees and assigns, workmen, material and supplies; the right to use, operate, maintain, replace, change the location of, and remove any wells, pumps, pipe lines, tanks, and filter plants now upon said land.

Cabot contended that, as a lessee of the oil and gas under the property, it was a beneficiary of the 1941 exculpatory clause and entitled to operate on the Thornsburys' tract "all without liability . . . for any injury to the surface of said land or to any structure or other property thereon by reason of . . . removing . . . minerals[.]"

The Thornsburys objected to Cabot's reliance upon the 1941 deed because the deed had never been produced during discovery. Furthermore, they claimed that the exculpatory clause in the 1941 deed was unenforceable because it was unconscionable and against West Virginia public policy. The Thornsburys noted that the Legislature statutorily banned the use of exculpatory clauses in deeds after 1983.[5] They therefore asserted that the circuit court should have ignored the 1941 exculpatory clause.

---

[5] As we discuss later, the Oil and Gas Production Damage Compensation Act, *West Virginia Code* § 22-7-1 to -8, requires oil and gas developers to pay the owner of the surface estate damages caused by drilling operations. *W.Va. Code* § 22-7-1(c) [1994] bans exculpatory clauses and states:

(c) The Legislature declares that the public policy of this state shall be that the compensation and damages provided in this article for surface owners may not be diminished by any provision in a deed, lease or other contract entered into after

(continued . . .)

6

Additionally, the Thornsburys argued to the circuit court that Cabot was bound by the 2006 contract. The Thornsburys asserted, regardless of the 1941 deed or any other document, that Cabot agreed in writing in the 2006 Right-of-Way Grant to build only a 200 foot long road, and agreed to stack all cut timber 10 inches and larger. They therefore contended that summary judgment was improper and that they were entitled to a trial on whether Cabot breached the agreement, and the extent of their damages.

In an order dated January 4, 2012, the circuit court granted Cabot's motion for summary judgment. The circuit court found no questions of material fact, and relied solely upon the exculpatory clause in the 1941 severance deed, which it called "a covenant against liability . . . for damages to the surface estate caused by [Cabot's] activities in exploiting its mineral oil and gas interests." It found that this "reservation [of minerals] and covenant against liability are clear, unambiguous and run with the land . . . [and] are each fully enforceable[.]" The circuit court found no error in Cabot's late production of the 1941 deed because the Thornsburys "have been on notice of the Severance Deed since the date it was recorded more than seventy (70) years ago." As a matter of law, the circuit court found that the Thornsburys had "no proper claim against [Cabot] for breach of contract for exceeding the terms of the [2006] Right-of-Way [Grant] . . . because [Cabot's] use of the surface of the Property does not exceed the

---

the ninth day of June, one thousand nine hundred eighty-three.

7

rights in and to the use of the surface of the Property as defined by the reservation contained in the [1941] Severance Deed."

The Thornsburys now appeal the circuit court's January 4, 2012, summary judgment order.

## II.
## STANDARD OF REVIEW

We review a circuit court's entry of summary judgment *de novo*. Syllabus Point 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

## III.
## ANALYSIS

The Thornsburys' best argument for why the circuit court erred in granting summary judgment is that a party's contractual obligations cannot be "pre-empted" by an exculpatory clause in a deed between different parties executed seven decades before the contract. The Thornsburys argue that Cabot contractually agreed in 2006 to build a road only 200 feet long, and to stack any cut timber 10 inches or greater in diameter. After review of the record, we agree that the circuit court erred. As we discuss below, the Thornsburys should be allowed to prove that Cabot breached the provisions of the 2006 agreement, and that Cabot may be liable for damages arising from this breach.

8

A deed is nothing more than "a written, contractual agreement reflecting the parties' intent." *Faith United Methodist Church v. Morgan*, 231 W.Va. 423, 443, 745 S.E.2d 461, 481 (2013). *See also Cabot Oil & Gas Corp. v. Huffman*, 227 W. Va. 109, 117, 705 S.E.2d 806, 814 (2010) (a "deed reflects the agreement" of the seller and buyer, and as such, a "deed is a contract."); Syllabus Point 2, *Koen v. Kerns*, 47 W.Va. 575, 35 S.E. 902 (1900) (a "deed represents the final contract of the parties" for the sale of property); *Am. Buttonhole, Overseaming & Sewing Mach. Co. v. Burlack*, 35 W.Va. 647, 652, 14 S.E. 319, 320 (1891) ("A deed is a writing or instrument, written on paper or parchment, sealed and delivered, to prove and testify the agreement of the parties whose deed it is, to the things contained in the deed."). Deeds "are much more solemn than the usual unsealed agreement not acknowledged for record," *Southern v. Sine*, 95 W.Va. 634, 638, 123 S.E. 436, 437-38 (1924), and are "instruments executed with formality," *Donato v. Kimmins*, 104 W.Va. 200, 204, 139 S.E. 714, 715 (1927), but they are contracts nonetheless.

It is a well-established, fundamental principle of contract law that a valid, unambiguous written contract may be modified or superseded by a subsequent contract based on a valuable consideration. As we said in Syllabus Point 1 of *Lewis v. Dils Motor Co.*, 148 W.Va. 515, 135 S.E.2d 597 (1964), "A valid, unambiguous written contract may be modified or superseded by a subsequent contract based on a valuable consideration." *See also*, *Wilkinson v. Searls*, 155 W.Va. 475, 484, 184 S.E.2d 735, 741 (1971) ("A valid, unambiguous written contract may be modified or superseded by a subsequent written or parol contract but only if the subsequent contract is based upon a valuable

9

consideration."); Syllabus Point 2, *State ex rel. Coral Pools, Inc. v. Knapp*, 147 W.Va. 704, 131 S.E.2d 81 (1963) ("A written contract may be altered or supplemented by a valid parol contract subsequently made."); *Wyckoff v. Painter*, 145 W.Va. 310, 315, 115 S.E.2d 80, 84 (1960) ("a written contract in some situations may be modified by the conduct of the parties or by a subsequent parol contract."); Syllabus Point 1, *Sanford v. First City Co.*, 118 W.Va. 713, 192 S.E. 337 (1937) ("A written contract may be modified by the subsequent conduct of the parties thereto with relation to the same subject matter."); and *Simpson v. Mann*, 71 W.Va. 516, 518, 76 S.E. 895, 896 (1912) ("Everywhere we find the law to be that a new or changed contract will take the place of or modify a former written contract[.]").

The record establishes that in 2006, Cabot and the Thornsburys contracted that Cabot (1) would build a road 200 feet in length on the 30 acre tract, (2) would build it in the location described in the right-of-way agreement, and (3) would stack any timber it cut that was 10 inches or larger. Cabot paid the Thornsburys $500.00 in consideration for the contract rights. Cabot allegedly constructed a road that was 1,100 feet longer in a different location and disposed of the timber it cut.

Assuming that the exculpatory clause in the 1941 deed is valid, unambiguous, and applies to the parties,[6] it was superseded by the 2006 contract on three

---

[6] Cabot entered no clear evidence before the circuit court to suggest that it is a beneficiary of the 1941 deed. We accept, for purposes of this Opinion, the representation of Cabot's counsel that the 1941 deed is valid, unambiguous, and applicable to the parties. Furthermore, neither we, nor the circuit court, nor the parties have parsed the language of the exculpatory clause to explain the extent of its

(continued . . .)

10

points: the length of the road to be constructed on the Thornsburys' estate, the location of the road, and the stacking of certain timber. On these three allegations by the Thornsburys, the circuit court plainly erred in finding that no genuine question of material fact remained for resolution.[7] The Thornsburys fairly alleged in their complaint that Cabot had agreed to limit the length of the road it constructed, to construct it in the location set out in the agreement, and to stack any timber it cut that was 10 inches or greater in diameter, and that it had breached its agreement.

---

applicability to Cabot's situation. We note, however, the general principle in our law that any ambiguity in the language of a deed "will be construed most strongly against the grantor," Syllabus Point 3, *West Virginia Dept. of Highways v. Farmer*, 159 W.Va. 823, 226 S.E.2d 717 (1976), and a construction "will be adopted which is most favorable to the grantee." Syllabus Point 6, *Paxton v. Benedum-Trees Oil Co.*, 80 W.Va. 187, 94 S.E. 472 (1917). *See also*, Syllabus Point 2, *Neekamp v. Huntington Chamber of Commerce*, 99 W.Va. 388, 129 S.E. 314 (1925) ("Restrictive covenants are to be strictly construed against the person seeking to enforce them, and all doubts must be resolved in favor of natural rights and a free use of property, and against restrictions.").

[7] The Thornsburys assert the circuit court erred in several other ways. Significantly, they contend that exculpatory clauses like that in the 1941 severance deed are unconscionable, against West Virginia public policy, and are unenforceable. We decline to consider this argument.

The Thornsburys also assert that the circuit court erred in ruling that the Thornsburys failed to join some unnamed, "indispensable parties" to their lawsuit. Rule 12(b)(7) of the *Rules of Civil Procedure* requires a defendant to assert an objection to the plaintiff's "failure to join a party under Rule 19" in its first responsive pleading, something Cabot does not appear to have done. Furthermore, the primary remedy for a plaintiff's failure to join a necessary party is not dismissal of the action, but rather to join the party needed for a just adjudication. *See* Rule 19. However, since the circuit court granted summary judgment under Rule 56, and not dismissal under Rule 19(b), we decline to consider this argument as well.

The Thornsburys, however, allege that they are entitled to additional damages that do not arise from any breach of the 2006 contract. They allege in their complaint they have a right to seek additional damages from Cabot because the contract did not allow Cabot to construct, maintain or operate a natural gas well on, or gas pipeline across, their surface estate. The Thornsburys also claim they are entitled to damages because the pipeline obstructs their use of a portion of their surface estate; for instance, they assert they can no longer access part of their land to extract timber.

West Virginia grants a surface owner certain common law remedies and statutory remedies that are non-contractual when an oil and gas developer damages the surface of their property.

First, the general, common law rule in West Virginia is that a mineral owner or developer has the right to enter the overlying surface estate, but only to do that which is "fairly necessary" or "reasonably necessary" for the extraction of the mineral. It is firmly established that the owner of a mineral estate has, "as incident to this ownership, the right to use the surface in such manner and with such means as would be fairly necessary for the enjoyment of the mineral estate." Syllabus Point 1, *Squires v. Lafferty*, 95 W.Va. 307, 121 S.E. 90 (1924). *See also*, *Porter v. Mack Mfg. Co.*, 65 W.Va. 636, 64 S.E. 853 (1909) (ownership of a mineral estate carries with it "an implied right to use the surface in such manner and with such means as would be fairly necessary for the enjoyment" of the mineral estate); Syllabus Point 2, *Buffalo Mining Co. v. Martin*, 165 W.Va. 10, 267 S.E.2d 271 (1980) (owner of the mineral estate may use the overlying surface estate "for purposes reasonably necessary to the extraction of the minerals.");

12

*Whiteman v. Chesapeake Appalachia, L.L.C.*, ___ F.3d ___, ___ (4th Cir., 2013) (Slip Op. at 12-13, No. 12-1790, Sept. 4, 2013) ("[I]n West Virginia, a mineral estate owner that enters upon a surface estate owner's land does so without lawful authority only if, under the 'reasonable necessity' standard, the mineral estate owner 'exceed[s] its rights . . . thereby invading the rights' of the surface estate owner."). *Cf. Faith United Methodist Church & Cemetery of Terra Alta v. Morgan*, 231 W.Va. at 440, 745 S.E.2d at 478 (the owner of the surface estate has "the right to use the surface for such ordinary uses as may be made thereof, with the right to use as much of the subsurface as may be necessary for the customary and ordinary uses of the surface, just as the owner of the subsurface estate has a correlative right to use the surface in order to develop the subsurface rights." (citation omitted)). A reasonable use of a surface estate by a mineral owner generally includes the construction of a road to access a drilling site. Syllabus Point 2, *Coffindaffer v. Hope Natural Gas*, 74 W.Va. 107, 81 S.E. 966 (1914) (a mineral owner "has the right to build a road over the land, when necessary to haul machinery and material to the place selected for drilling a well.").

Whether a surface owner's rights have been invaded, or whether a mineral owner has exceeded its rights are questions to be resolved by the court.

> In a case where there is a dispute of fact, the jury should find the facts, and from such finding of facts by the jury it is the duty of the court to determine whether the use of the surface by the owner of the minerals has exceeded the fairly necessary use thereof, and whether the owner of the minerals has invaded the rights of the surface owner, and thus exceeded the rights possessed by the owner of such minerals.

*Adkins v. United Fuel Gas Co.*, 134 W.Va. 719, 724, 61 S.E.2d 633, 636 (1950).

13

Second, the West Virginia Legislature has clarified that a surface owner is entitled to compensation for losses wrongfully caused by an oil and gas developer. The West Virginia Oil and Gas Production Compensation Act, *W.Va. Code* §§ 22-7-1 to -8, was enacted to

> provide constitutionally permissible protection and compensation to surface owners of lands on which oil and gas wells are drilled from the burden resulting from drilling operations commenced after the ninth day of June, one thousand nine hundred eighty-three. . . . This article shall be interpreted to benefit surface owners, regardless of whether the oil and gas mineral estate was separated from the surface estate and regardless of who executed the document which gave the oil and gas developer the right to conduct drilling operations on the land.

*W.Va. Code* § 22-7-1(d) [1994]. The Act goes on to require an oil and gas developer to pay a surface owner certain damages, including diminution in value of the surface lands, for any drilling operations commenced after June 9, 1983. *W.Va. Code* § 22-7-3 [1994]. Further, the Act explicitly preserves "the common law remedies, including damages, of a surface owner . . . against the oil and gas developer for the unreasonable, negligent or otherwise *wrongful exercise of the contractual right*, whether express or implied, to use the surface of the land for the benefit of the developer's mineral interest." *W.Va. Code* § 22-7-4(a) [1994] (emphasis added).

The Thornsburys do not assert in their complaint causes of action for violations of the common law or of the Oil and Gas Production Compensation Act. As the Thornsburys' case is pled in their complaint, they have only fairly asserted one claim: for breach of the 2006 right-of-way contract. That contract pertains to Cabot's promise

14

to build a road only 200 feet in length, the location of the road, and Cabot's promise to stack certain timber. Genuine issues of material fact were established on whether Cabot breached the contract, and it was error for the circuit court to have granted summary judgment on this question.[8]

## IV.
## CONCLUSION

The circuit court's January 4, 2012, summary judgment order is reversed, and the case is remanded for further proceedings.

Reversed and Remanded.

---

[8] On remand, the circuit court will need to determine, if raised, whether Cabot has any liability for the portion of the road that exceeds 200 feet under the common law "reasonable necessity" standard.

15